UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBIN R. VANPORTFLIET,         )
                                     )
               Plaintiff,     )     Case No. 1:10-cv-578
                                     )
v.                              )     Honorable Paul L. Maloney
                                   )
COMMISSIONER OF            )
SOCIAL SECURITY,           )
                                   )     **REPORT AND RECOMMENDATION**
               Defendant.     )
_____)

          This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking

review of a final decision of the Commissioner of Social Security denying plaintiff's claims for

disability insurance benefits (DIB) and supplemental security income (SSI) benefits. On November

22, 2006, plaintiff filed her applications for benefits alleging a November 8, 1997 onset of disability.[1]

(A.R. 122-28). Plaintiff's disability insured status expired on March 31, 2004. Thus, it was

plaintiff's burden on her claim for DIB benefits to submit evidence demonstrating that she was

disabled on or before March 31, 2004. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

          Plaintiff's claims for DIB and SSI benefits were denied on initial review. (A.R. 79-

87). On August 20, 2009, she received a hearing before an administrative law judge (ALJ), at which

she was represented by counsel. (A.R. 27-75). On August 28, 2009, the ALJ issued a decision

---

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed. Thus, December 2006 is plaintiff's earliest possible entitlement to SSI benefits.

finding that plaintiff was not disabled.  (A.R. 10-21).  On April 22, 2010, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

On June 18, 2010, plaintiff filed her complaint seeking judicial review of the Commissioner's decision denying her claims for DIB and SSI benefits.  She asks the court to overturn the Commissioner's decision on the following grounds:

1.  The Commissioner "erred as a matter of law in postulating an RFC that relied on the opinion of an outdated, non-examining SSA assessment in finding that Ms. VanPortfliet is limited to simple, routine, repetitive tasks;"

2.  The Commissioner erred as a matter of law in assessing lay testimony;

3.  The Commissioner erred as a matter of law in assessing Ms. VanPortfliet's credibility; and

4.  The Commissioner erred as a matter of law "in failing to sustain his burden that there is other work in the national economy that Ms. VanPortfliet can perform."

(Statement of Issues, Plf. Brief at 4, docket # 13).[2]  Upon review, I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision.  I recommend that the Commissioner's decision be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether

---

[2]The court's order directing the filing of briefs states:  "Initial briefs may not exceed 20 pages without leave of court."  (8/30/10 Order, docket # 10).  The court's order granting plaintiff's motion for an extension of the deadline for filing her initial brief again emphasized that the brief may not exceed 20 pages.  (9/21/10 Order, docket # 12).  Plaintiff's attorney offers no explanation for flouting the court's orders by filing a 26-page initial brief.  He repeated the same pattern in plaintiff's reply brief.  The court's orders establish that the reply brief is "not to exceed five pages."  Plaintiff's reply brief is almost twice the permitted length.  Attorney Benjamin J. Smyko is hereby advised that any future brief ignoring the applicable page limitations will result in the imposition of sanctions.

the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ."  42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."  *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from November 8, 1997, through March 31, 2004, but not thereafter.  (A.R. 12). Plaintiff had not engaged in substantial gainful activity on or after November 8, 1997.[3] (A.R. 12). Plaintiff had the following severe impairments: "left hip displasia, status-post left hip replacement surgery; degenerative disc disease of the lumbar spine; migraine headaches; bi-polar disorder; depression; anxiety; and post traumatic stress disorder."  (A.R. 12).  Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments.  (A.R. 13).  The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of sedentary work:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasionally lift up to ten pounds; sit for approximately six hours and stand or walk for approximately two hours per eight-hour workday, with normal breaks, and the ability to sit or stand at will provided not off task more than ten percent of the work period and provided no period of sitting or standing exceeds 30 minutes; occasionally climb ramps or stairs, and never climb ropes, ladders or scaffolds; frequent balancing, occasional stooping, kneeling, crouching and crawling; work limited to simple, routine, repetitive tasks but able to follow instructions, adjust to change, respond to supervision and make simple decisions and judgments.

(A.R. 14).  The ALJ found that plaintiff's testimony regarding her subjective limitations was not fully credible.  (A.R. 14-19).  Plaintiff was unable to perform her past relevant work.  (A.R. 19). Plaintiff was 34-years-old as of the date of her alleged onset of disability, 40-years-old when her disability insured status expired, and 46-years-old as of the date of the ALJ's decision.  Thus, at all

---

[3]The ALJ found that plaintiff worked from September 2005 until April 2006, and that this constituted substantial gainful activity.  (A.R. 12).  He indicated that if his decision had been in favor of awarding benefits, this period would have been considered a "trial work period."  (A.R. 12).

times relevant to her claims for DIB and SSI benefits, plaintiff was classified as a younger individual. (A.R. 19). Plaintiff has at least a high-school education and is able to communicate in English. (A.R. 19). The transferability of job skills was not material to a disability determination. (A.R. 19). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 6,000 jobs in the State of Michigan that the hypothetical person would be capable of performing. (A.R. 71-72). The ALJ found that this constituted a significant number of jobs. Using Rules 201.28 and 201.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled. (A.R. 20-21).

## 1.

Plaintiff argues that the ALJ "erred as a matter of law in postulating an RFC that relied on the opinion of an outdated, non-examining SSA assessment and in finding that Ms. VanPortfliet[4] is limited to 'simple, routine, repetitive tasks.'" (Plf. Brief at 15). She argues that the ALJ's factual finding regarding her RFC should have found a higher level of functional restriction stemming from her mental impairments:

> While the ALJ found that Ms. Van Portfliet's affective disorders are severe, he determined the sole mental limitation flowing from the impairment is a limitation to "simple, repetitive tasks" and that she must be able to follow instructions, adjust to change, respond to supervision and make simple decisions and adjustments. (Tr. 14). In so finding, the ALJ rejected contrary medical evidence of record from treating physician Dr. Orellana of Arbor Circle and the opinions of examining physicians, Dr. Baird and Dr. Wagner. He also provided improper reasons for giving very little weight to the opinion of Dr. Wagner, a

---

[4]Plaintiff's last name appears as "VanPortfliet" in her complaint and as "VanPortfliet" and "Van Portfliet" in her initial and reply briefs. This report and recommendation utilizes the spelling found in plaintiff's complaint, except in instances where the alternate spelling appears within a quotation.

consulting [psychologist], by rationalizing that Dr. Wagner['s opinion] was "purchased by the claimant's attorney along with a one-time assessment in July 2009."

* * *

The opinion of Dr. Wagner is consistent with the other evidence of record, including the opinions of the State agency examining psychologist Dr. Baird and the medical evidence provided by Dr. Orellana of Arbor Circle, Ms. Van Portfliet's treating psychiatrist. (Tr. 317-323, 471-486, 508-511). The affective disorder diagnosis and GAF scores -- ranging from 45-55 -- remain consistent throughout the evidence of record and the longitudinal course of care. The RFC postulated by the ALJ is based upon the opinions of a non-examining physician, Dr. Schirado, in which he notes Dr. Baird's diagnosis of a Cyclothemic disorder and a GAF of 45 but ultimately concludes that there are no mild, marked, or extreme limitations -- a conclusion inconsistent with the entirety of the medical record.

(Plf. Brief at 15, 20; *see* Reply Brief at 1-6). Upon review, I find no error. The ALJ's factual finding regarding plaintiff's RFC is supported by more than substantial evidence. The ALJ gave appropriate weight to Dr. Orellana's opinions. RFC is an administrative finding of fact reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Plaintiff's reliance on various global assessment of functioning scores is misplaced because GAF scores are not objective medical evidence and are not entitled to any particular weight. The ALJ did not rely on "an outdated, non-examining SSA assessment," and he did not commit error when he found that the extreme restrictions suggested by Psychologist Wagner were entitled to little weight.

RFC is the most, not the least, a claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Kornecky v. Commissioner*, 167 F. App'x 496, 499 (6th Cir. 2006). RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Deaton v. Commissioner*, 315 F. App'x 595, 598 (6th Cir. 2009); *Ford v. Commissioner*, 114 F. App'x 194, 198 (6th Cir. 2004). "In formulating a residual functional capacity, the ALJ evaluates all the relevant medical and other evidence and considers what weight

to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Commissioner*, No. 10-3820, 2012 WL 616661, at * 2 (6th Cir. Feb. 27, 2012).

A.    DIB Benefits Claim

Plaintiff presented extraordinarily little evidence in support of her claim for DIB benefits.  She claimed a November 8, 1997 onset of disability; her disability insured status expired on March 31, 2004.  Plaintiff was born with a congenital left hip deformity.  (A.R. 305).  On August 28, 1990, she was admitted to Forest View Hospital with complaints of depression.  She was a 27-year-old mother of four children.  She and the children were living with her parents.  (A.R. 270).  Plaintiff was in the process of obtaining a divorce from an unfaithful husband.  (A.R. 270).  Plaintiff had no history of psychiatric problems.  (A.R. 269).  "She [had been] active in school, popular and involved in cheerleading.  She had many friends and was also involved in dance and civic theater." (A.R. 270).  She had achieved a 3.4 GPA in high school and attended some community college classes.  (A.R. 270).  She stated that she had used cocaine two times in the previous six months.  She had some alcohol problems which she "tended to minimize."  (A.R. 272).[5]  Plaintiff appeared to be healthy, and was not in any acute distress.  (A.R. 276).  She was diagnosed as having an adjustment disorder with depressed mood and a history of cocaine and alcohol abuse and was discharged on

_____

[5]Since 1996, the Social Security Act, as amended, has precluded awards of SSI and DIB benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that drug and alcohol addiction is not a contributing factor to her disability. *See Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007);*Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability.

September 7, 1990.  (A.R. 269-84).  Plaintiff did not submit any medical records for the years 1991 through 1998.

On May 2, 1999, plaintiff was 35-years-old and was treated for a right arm laceration. She stated that she had been doing yard work and drinking some alcohol.  She reported that the glass broke when she pushed on an entry door.  She received stitches and was sent home.  (A.R. 285-86).

On March 31, 2004, plaintiff's disability insured status expired.  The ALJ's factual finding that plaintiff retained the RFC for a limited range of sedentary work as of her date last disability insured is supported by more than substantial evidence.  In fact, as of 2004, the record would have supported a much greater RFC.

Plaintiff's medical records after her date last disability insured document her ongoing substance abuse problems.  On January 18, 2005, plaintiff appeared for a psychiatric evaluation by Gary L. Rich, M.D.  (A.R. 290-93).  Dr. Rich reported that plaintiff was 41-years-old and married. She had recently participated in a 30-day substance abuse program.  She "really started abusing alcohol when she was 35 years old."  (A.R. 290).  Her longest period of sobriety in recent years had been two months.  (A.R. 290).  Plaintiff reported that she was attending classes at Davenport University.  She was working towards an applied science degree and wanted to work in the medical field.  (A.R. 291).  Dr. Rich noted that plaintiff was cooperative during the interview.  Her gait, speech, and level of psychomotor movement were within normal limits.  (A.R. 292).  She  was alert and oriented in all three spheres.  Her memory, concentration, general fund of knowledge, and ability to abstract were grossly intact.  Psychiatrist Rich offered a diagnosis of severe depression, recurrent, ADHD, and alcohol abuse.  He gave plaintiff a GAF score of 65.  He noted that plaintiff's prognosis

was fair.  She had a reasonable chance of gaining stability if she maintained sobriety and continued outpatient treatment.  (A.R. 292).

Spectrum Health emergency room records dated July 18, 2005, describe plaintiff as a "42-year old female who is an alcoholic and has been drinking tonight.  She became angry at her husband and slammed a door.  She broke the glass and lacerated her left thumb."  (A.R. 308).  Plaintiff requested alcohol detox.  (A.R. 308).  She received stitches and was referred to a social worker to get her into a "detox and alcohol treatment program."  (A.R. 308).

On August 23, 2005, plaintiff returned to Dr. Rich.  Plaintiff stated that she had relapsed in May 2005.  She had been hospitalized in a Florida substance abuse facility from July 27, 2005, through August 19, 2005.  (A.R. 294).  She returned to Michigan following her discharge from the Florida facility.  Dr. Rich encouraged plaintiff to put her energies toward establishing her sobriety.  (A.R. 294).

On May 30, 2006, plaintiff gave Cherry Street Health Services a history indicating that she drank "1-2" alcoholic drinks daily, smoked "1-2" packs of cigarettes per day, and had no other history of substance abuse.  (A.R. 405).  An October 24, 2006 CT scan of plaintiff's thorax was unremarkable.  (A.R. 306-07).

B.     SSI Benefits Claim

On November 22, 2006, plaintiff filed her applications for SSI and DIB benefits.  On January 28, 2007, Shahnaz Ali, M.D., of the Ferguson Adult Health Center (Ferguson Center) examined plaintiff.  He found that plaintiff had no physical limitations.  She could stand and/or walk at least 2 hours in an 8-hour workday.  She had no mental limitations.  Her condition was stable.  Her

medications were Cymbalta, Ativan, and Imitrex.  (A.R. 406-07).  On January 30, 2007, plaintiff returned to the Ferguson Center and reported that a neurologist had previously prescribed Fioricet for her left hip pain.  Doctors at Ferguson Center declined to prescribe Fioricet.[6]  They encouraged plaintiff to take "Motrin or ibuprofen as needed for pain." (A.R. 315).  A February 13, 2007 lumbar spine MRI revealed "minor disk degeneration of the lumbar disks with bulging of some of the disks but no herniation or stenosis." (A.R. 305, 316).  On March 5, 2007, plaintiff was described as alert and oriented in all spheres.  She was in no acute distress.  She was advised to continue taking Prozac and Ativan on a "PRN" basis for depression and anxiety.  She was encouraged to stop smoking and referred to a pain clinic for treatment of her left hip and back.  (A.R. 314).  On April 3, 2007, plaintiff was treated by Dr. Ali at the Ferguson Clinic.  Plaintiff was seeking refills of Paxil and Ativan and Imitrex samples. (A.R. 390).  Plaintiff's April 4, 2007 thorax CT revealed no new lung nodules.  (A.R. 404).  Her June 24, 2007 cervical spine x-rays returned normal results.  (A.R. 403).

1.      June 27, 2007 Consultative Examination by Psychologist Baird

On June 25, 2007,  Robert J. Baird, Ph.D., conducted a consultative examination. (A.R. 317-22).  Plaintiff reported that this was her second application for social security benefits. (A.R. 317).  She stated that she was not participating in mental health counseling. (A.R. 317).  She gave a history of two suicide attempts, the most recent occurring "in 2000 when she deliberately overdosed on Tylenol and alcohol." (A.R. 318).  Plaintiff had attended regular education courses

---

[6]Fioricet contains a barbiturate component and is used to treat tension headaches.  *See* http://drugs.com/fioricet.html (last visited March 20, 2012).  Because the barbiturate component is habit-forming, extended use of this product is not recommended.  "Fioricet may enhance the effects of other narcotic analgesics, alcohol, general anesthetics, and tranquilizers such as chlordiazepoxide, sedative-hypnotics, or other CNS depressants." http://www.rxlist.com/fioricet-drug-center.htm (last visited March 20, 2012).

and had never repeated a grade in high school. She had no history of school-related behavioral problems. (A.R. 317). She had participated in multiple extracurricular activities. She had earned significant college credits at Davenport University. (A.R. 318). She had been married and divorced four times. (A.R. 318). When asked about her substance abuse history, plaintiff replied that she had used marijuana approximately two years earlier, but denied use of any other drug, inhalant, or abuse of prescription medications. (A.R. 319). Plaintiff reported that she had been in alcohol rehabilitation on two occasions: "in the Winter of 2003 after which she maintained sobriety for seven months, and the Summer of 2004 when she maintained sobriety for one month." (A.R. 319). Plaintiff stated that her current alcohol use was "on the weekend, maybe a glass of wine." (A.R. 319). Plaintiff was pleasant and cooperative and she appeared of normal intelligence. She was oriented to person, place, and time. She had no history of hallucinations or delusions. Her ambulation and speech were normal. Psychologist Baird offered a diagnosis of "Cyclothymic Disorder" and gave plaintiff a GAF score of 45. (A.R. 321).

Plaintiff argues that the ALJ should have given greater weight to the low GAF score supplied by Psychologist Baird. (Plf. Brief at 15, 20). This argument is meritless. GAF scores are not entitled to any particular weight. *See Kornecky v. Commissioner*, 167 F. App'x at 511. "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009). A GAF score is a subjective rather than an objective assessment. *Id*. "GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into

-11-

a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n.7. The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning."[7]  *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011).

> 2.    July 9, 2007 Evaluation by Psychologist Schirado

On July 9, 2007, William Schirado, Ph.D., reviewed plaintiff's medical records and completed a "Psychiatric Review Technique" assessment.  He noted that plaintiff had been diagnosed with a cyclothemic disorder, but found that it did not rise to the level of a severe impairment.  (A.R. 324, 336).  Psychologist Schirado indicated that plaintiff's mental impairment fell well below the requirements of listing 12.04 for affective disorders.  Plaintiff did not satisfy Part B of Listing 12.04 because she had "mild" restriction of activities of daily living, "mild" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.  Plaintiff likewise fell short of the listing's Part C severity requirements.  (A.R. 324-33).

Plaintiff is incorrect when she argues that the ALJ "adopted the Mental RFC of Dr. Schirado." (Plf. Brief at 20).  If that had actually been the case, plaintiff's RFC would not have included any restrictions based on her mental impairments.  The ALJ gave little weight to

_____

[7]"Significantly, the SSA has refused to endorse the use of the GAF scale."  *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).  GAF scores "have no direct correlation to the severity requirements of the mental disorder listings." *DeBoard v. Social Security Admin.*, 211 F. App'x 411, 415 (6th Cir. 2006).

Psychologist Schirado's opinions: "Concerning mental capacity, the State agency medical consultant found the claimant had no severe mental impairment (Ex. 7F). This was based on very limited evidence and is not supported by the full record." (A.R. 19).

### 3.    Medical Care from July 10, 2007 through February 4, 2008

The ALJ's finding that plaintiff retained the RFC for a limited range of sedentary work is further reinforced by the medical records for the period between Psychologist Schirado's evaluation and plaintiff's initial contact with Psychologist Orellana.

On July 31, 2007, June D. Hillelson, D.O., conducted a consultative examination. (A.R. 341-48). Dr. Hillelson wrote: "This 44 year old white female drove herself to the office today with a complaint of low back pain for the last 10 years, due to compensating for a congenital deformed left hip." (A.R. 341). Plaintiff had never participated in physical therapy or required back or hip surgery. Plaintiff stated that she experienced migraine headaches, but could "go for months without having one." (A.R. 341). Dr. Hillelson wrote, "This patient is an alcoholic, who is still drinking, and had her last drink one week ago. (A.R. 342). Plaintiff was alert and oriented in all three spheres. (A.R. 343). Her muscle strength was 5/5 in all muscle groups tested. Plaintiff's extremities had no clubbing, cyanosis, or edema. Dr. Hillelson offered an opinion that plaintiff was capable of performing "sedentary types of activities." She could "stand for 30 minutes, perform some bending and stooping, lift up to ten pounds, use her hands for either fine or gross motor skills, perform some squatting, climb one flight of stairs and walk for 30 minutes at a time." (A.R. 344). Dr. Hillelson advised plaintiff to stop smoking and drinking. (A.R. 344).

-13-

On August 10, 2007, a State Agency physician reviewed plaintiff's records and offered an opinion that plaintiff was able to frequently lift and carry ten pounds, stand and/or walk for at least 2 hours in an 8-hour workday, and sit for a total of 6 hours in an 8-hour workday. (A.R. 351-58). August 28, 2007 x-rays of plaintiff's left hip revealed a stable deformity of the left femoral head. (A.R. 401).

On September 12, 2007, plaintiff was examined at Ferguson Center by Thomas C. Platt, M.D. (A.R. 388). Plaintiff's straight leg raising test was slightly positive on the left. Her knees showed a fairly good range of motion with no obvious effusion. There was no ankle edema. Dr. Platt noted that plaintiff's April 14, 2007 chest x-rays showed stable left lung nodules which were most likely post-inflammatory in nature. (A.R. 388). Plaintiff reported that had "done well" on Imitrex for her migraine headaches. (A.R. 388). She reported that her anxiety responded to Ativan, but she frequently had to take two capsules and she quickly ran out of medication. (A.R. 388). On October 3, 2007, plaintiff told Dr. Platt that she occasionally drank alcohol. She stated that her last heavy use had occurred more than three years earlier. She related that she had no other history of substance abuse. She reported that she had smoked a pack of cigarettes per day for thirty years. (A.R. 385). Plaintiff had no muscle pains or weakness. She had a full range of motion in her extremities, with the exception of her left hip. Straight leg raising tests were negative bilaterally. Dr. Platt found that plaintiff's reported neck pain was probably muscular in nature. She did not experience radiculopathy. Dr. Platt advised plaintiff to "continue to stay as active as possible." (A.R. 386).

An October 11, 2007 MRI of plaintiff's left hip revealed no evidence of acute fracture or dislocation. There was evidence of hip displasia. (A.R. 381-82, 399-400). October 24, 2007 x-

-14-

rays and CT scans of plaintiff's lungs indicated that her left-sided pulmonary nodules were stable. There was no acute infiltrate or pleural effusion. (A.R. 396-98). On October 25, 2007, plaintiff reported that she continued to smoke cigarettes, but denied any current alcohol or drug use. (A.R. 423-24). On November 5, 2007, plaintiff had outpatient arthroscopic surgery performed on her left hip. (A.R. 420-22, 429-31).

On November 16, 2007, plaintiff appeared at the Spectrum Health emergency room complaining of migraine headaches. She related that she had been taking Fioricet at home as well as Excedrin. Plaintiff was treated with Toradol, Benadryl, and Dilaudid which provided her with complete relief from her headache symptoms. (A.R. 363). On November 17, 2007, plaintiff appeared at Spectrum Health and reported that she had been in a fight with her boyfriend. (A.R. 359-66). Upon examination, there were no signs of injury. (A.R. 359). Plaintiff received treatment in response to her headache complaints and was referred to a social worker. (A.R. 360).

On December 13, 2007, a social worker sought an involuntary psychiatric hospitalization. According to the report, plaintiff had been arguing with her boyfriend who encouraged her to kill herself. Plaintiff had been drinking alcohol and apparently responded to her boyfriend's taunts by taking multiple pills.[8] (A.R. 409-15).

---

[8]The ALJ noted significant omissions from the records plaintiff submitted in support of her claims: "There is no record of probate court disposition regarding this petition, or records of the specific hospital stay." (A.R. 17). "A report from Arbor Circle discussing admission for outpatient therapy on December 26, 2007 mentions the claimant's eight-day inpatient status at Pine Rest after the petition followed by a five-day involvement with River Valley Crisis Center, a substance abuse rehabilitation program. The claimant and her attorney have not provided any records from her stay at Pine Rest or the River Valley encounter." (A.R. 17). "The Arbor Circle Report (Ex. 17F)[A.R. 471-86] provided by the claimant's attorney includes an intake application for outpatient therapy, several medication reviews, but no therapy notes." (A.R. 17).

On January 3, 2008, plaintiff saw Dr. Platt at Ferguson Center. Plaintiff reported that she continued to visit the emergency room for treatment of migraines. Plaintiff stated that at Pine Rest she had received Tylenol # 3 and also some Fioricet, and that seemed to help the headaches. She stated that she continued to smoke more than a pack of cigarettes per day. Dr. Platt counseled plaintiff on smoking cessation. He provided plaintiff with a prescription for Tylenol # 3 "to try to prevent ER visits." (A.R. 535-36).

On January 15, 2008, plaintiff reported that her left hip pain was worse after arthroscopic surgery. Doctors at Spectrum Health prescribed a course of physical therapy. (A.R. 418-19).

4.   Plaintiff's Sessions with Psychiatrist Orellana at Arbor Circle: February 5, 2008 to December 8, 2008

On February 5, 2008, plaintiff was seen at Arbor Circle by Elbin Orellana, M.D. Dr. Orellana described his role on this occasion, and every other meeting with plaintiff, as that of a "consulting psychiatrist." The initial consultative session lasted 45 minutes, and subsequent medication reviews lasted 15 minutes. On February 5, 2008, plaintiff complained that she was depressed, anxious, and that her medications were not working. She related a history of alcoholism from her early thirties through November 2007. Plaintiff was oriented to time, place, and person. Her memory and concentration were grossly intact. Dr. Orellana offered a diagnosis of "Bipolar Disorder II" and "Alcohol Dependence, continuous" and gave plaintiff a GAF score of 45. (A.R. 485).

On April 15, 2008, Dr. Orellana conducted a medication review. Plaintiff denied any hallucinations, delusional thinking, paranoid ideation or suicidal ideation. Her memory and

-16-

concentration were grossly intact.  Dr. Orellana gave plaintiff a GAF score of 50.  He continued plaintiff's prescriptions for lithium carbonate and Wellbutrin and initiated a trial of Zoloft.  (A.R. 481-82).

On May 1, 2008, plaintiff appeared at St. Mary's Healthcare on a self-referral seeking voluntary admission based on her complaints of worsening depression, nightmares, and irritability. (A.R. 434-35).  Plaintiff reported to medical care providers at St. Mary's that she had been diagnosed as having bipolar disorder and that she had attempted suicide on three occasions.  (A.R. 438-39). Plaintiff's May 3, 2008 test results were positive for opiates and "barbiturate serum."  (A.R. 465). Plaintiff was diagnosed as having bipolar disorder, severe, most recent episode mixed with psychotic features, post traumatic stress disorder, alcohol abuse, nicotine dependence, and a dependent personality disorder.  (A.R. 437).  On May 4, 2008, plaintiff was evaluated by Psychiatrist Jeffrey J. Vrielink, M.D.  She stated that she had been "in a series of four marriages, where she was either abused or her husbands cheated."  (A.R. 440).  Plaintiff gave a history indicating that she had "been sober for about 5 months."  (A.R. 440).  She denied illicit substance use.  She stated that she had tried cocaine in the past and didn't like it.  (A.R. 440).  Plaintiff agreed "to abstain from alcohol and marijuana and keep follow-up appointments and continue with medication."  (A.R. 437).  During plaintiff's stay at St. Mary's, she referred to Dr. Orellana as her "outpatient psychiatrist" and Theresa Canton as her "outpatient therapist" at Arbor Circle.  (A.R. 437, 440).

On June 10, 2008, Dr. Orellana met with plaintiff for a medication review.  He noted that plaintiff was living with her mother rather than her abusive ex-boyfriend.  Plaintiff was oriented in all three spheres.  Dr. Orellana offered a diagnosis of bipolar disorder, mixed, in partial remission, and gave plaintiff a GAF score of 50.  (A.R. 479-80 ).

On June 17, 2008, Diljit Karayil, M.D., examined plaintiff in preparation for a left total hip arthroplasty. Plaintiff was not in any apparent distress. She was awake, alert and oriented. Dr. Karayil approved plaintiff's surgery, provided that her chest x-rays returned grossly normal results and no other limiting factors were discovered. (A.R. 531-33). Plaintiff had left hip replacement surgery in July 2008. (A.R. 506).

On July 15, 2008, Dr. Orellana conducted a medication review. He noted that plaintiff's condition had stabilized on Abilify and Lithium Carbonate. (A.R. 477). On September 16, 2008, Dr. Orellana described plaintiff as alert, bright, focused, non-delusional. She was not experiencing crying spells and her depression had lifted. There was no evidence of suicidal ideation or evidence of psychotic-like symptoms. (A.R. 475).

On October 9, 2008, Dr. Karayil noted that plaintiff reported feeling better after her hip surgery. She denied any history of headache or visual disturbances. Plaintiff was seeking pain medication. She reported that the Ultram she was taking "did not help her that much." Plaintiff denied alcohol and other substance abuse. She had no gross sensory or motor deficits in her upper or lower extremities. Dr. Karayil stated that he would provide plaintiff with Tylenol #3, but limited the prescription to 30 pills in light of plaintiff's overdose history. (A.R. 529-30).

On December 8, 2008, plaintiff had the last of her 15-minute medication reviews with Dr. Orellana. (A.R. 510). Plaintiff reported that she was recovering from hip surgery. She felt that the surgery was "worth it" because she could "bend more now." (A. R. 510). She was scheduled to "restart physical therapy" the following week. Plaintiff was described as bright, alert, focused, and non-delusional. Her insight and judgment were described as fair. There was "no evidence of psychotic like symptoms." Dr. Orellana gave plaintiff a GAF score of 55. (A.R. 510). On February

-18-

28, 2009, Arbor Circle discharged plaintiff as a patient. (A.R. 508). Plaintiff had been ambivalent towards making changes in her life and failed to attend counseling sessions.[9] (A.R. 508). The discharge summary stated: "Robin saw Dr. Orellana for an initial psychiatric evaluation on 2/5/08, and attended five medication reviews before being referred to her primary doctor." (A.R. 508). Plaintiff's diagnosis on discharge from Arbor Circle was bipolar disorder and alcohol dependence. (A.R. 509).

Plaintiff argues that the ALJ should have given greater weight to Dr. Orellana's GAF scores because he was a treating psychiatrist. (Plf. Brief at 15, 20; Reply Brief at 1-6). It is doubtful that Dr. Orellana was a treating psychiatrist. He always referred to his role as that of a "consulting psychiatrist," rather than a treating psychiatrist. (A.R. 475, 477, 479, 481, 483, 510, 525). His contact with plaintiff was infrequent and brief. Dr. Orellana met with plaintiff for five brief medication reviews after her initial intake session at Arbor Circle. (A.R. 508). The ALJ carefully considered Dr. Orellana's medication reviews and the fact that plaintiff's condition was improving with treatment. (A.R. 17-18). If plaintiff had submitted Arbor Circle therapy notes in support of her claims, they may have documented a greater role for Dr. Orellana in her care. The ALJ was never provided with the therapy notes, and the records regarding plaintiff's treatment at Pine Rest and River Valley Crisis Center were conspicuously absent from the administrative record. (A.R. 17). Based on the limited evidence provided, it was not error to consider Dr. Orellana as a consulting physician rather than as a treating physician. *See Kornecky v. Commissioner*, 167 F. App'x at 506-

---

[9]The discharge summary states that Ms. Carter was plaintiff's therapist for twelve sessions at Arbor Circle and that plaintiff attended six sessions with another therapist. (A.R. 508-09).

On April 2, 2009, plaintiff returned to the Ferguson Center and was examined by Dr. Platt. Plaintiff stated that she occasionally consumed alcohol and had engaged in heavy alcohol use three years earlier. She denied other substance abuse. (A.R. 520-22).

07.  In any event, the GAF scores he supplied would not have been entitled to any particular weight.

*Id.* at 511.  Dr. Orellana never expressed an opinion that plaintiff's mental impairments would

prevent her from performing simple, routine, repetitive tasks.

       5.      Psychologist Wagner's July 27, 2009 Evaluation

      On July 27, 2009, Victor Wagner, Ph.D., met with plaintiff on a referral from

plaintiff's attorney.  Wagner described the purpose of his meeting with plaintiff as follows:  "The

purpose of the meeting was to assess if Robin's capacity to work a fulltime job was limited by a

psychological/psychiatric disability."  (A.R. 549).  Wagner interviewed plaintiff for an unspecified

length of time and he did not administer any tests.  (A.R. 549-52).  His report to plaintiff's attorney

offered the following diagnosis:

| | |
|---|---|
| Axis I | 296.89 (Bi Polar II Disorder) |
| | 309.81 (Post Traumatic Stress Disorder) |
| | 307.89 (Pain Disorder Associated with Psychological Features and General Medical Condition) |
| | 305.00 (Alcohol Abuse-in Remission) |
| Axis II | 301.6 (Dependent Personality Traits) |
| Axis III | Hip Displasia/Hip Replacement/Chronic Pain |
| Axis IV | Finance, Health, Social, Family |
| Axis V | 50. |

(A.R. 551).  Psychologist Wagner provided his opinion that plaintiff had "extreme" limitations in

her ability to deal with work stresses, maintain attention and concentration, understand, remember

and carry out complex job instructions, behave in an emotionally stable manner, relate predictably

in social situations, demonstrate reliability, and maintain concentration, persistence or pace.  Wagner

opined that plaintiff had "marked" limitations in all other areas, with the exception of a "moderate"

limitation in her ability to remember, carry out and understand simple job instructions, .  (A.R. 546-

-20-

48).  Psychologist Wagner's report concluded with an emphatic statement of his opinion that plaintiff

was disabled:

> Currently, the effects of trauma, depression, pain and anxiety are too pronounced for Robin to be successful at work.  Failure in the work context would be inevitable and would be a major setback and would exacerbate her experience of depression and anxiety.  **It is my belief that Robin is severely limited and cannot work at a fulltime job nor complete a workweek without problems and symptoms described, interfering.  I believe she meets and exceeds the Social Security Disability requirements for Affective Disorder.  The Bi Polar Disorder (296.89) and the Pain Disorder (307.89) impinge on Robin and make functioning in a work context impossible for her.  Further, the Post Traumatic Stress Disorder significantly impacts Robin's ability to concentrate and maintain social functioning.  She is clearly unable to work a full time job and should be considered disabled.**

(A.R. 552) (bold print in original).  The consultative psychologist's opinions on the issues of

disability and whether plaintiff met or equaled the requirements of a listed impairment were entitled

to no weight because the issues are reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(e)(1),

(2), 416.927(e)(1), (2).

The ALJ found that the extreme limitations proffered by Psychologist Wagner were

entitled to little weight:

> Also in evidence is an opinion by psychologist Victor Wagner purchased by the claimant's attorney along with a one-time assessment in July 2009 (Ex 22F).  Dr. Wagner opined that the claimant has marked or extreme limitations in every area assessed on the standard form. In postulating a GAF of 50 he suggested that she has serious symptoms.  His assessment is given little weight as it is based on a one-time assessment, and is considerably inconsistent with the claimant's testimony and the longitudinal records from treating sources.
>                                         * * *
> In sum, the above residual functional capacity assessment is supported by the objective evidence showing minimal lumbar spine disc degeneration; congenital hip dysplasia that caused pain and limitations to sedentary work before surgery, and standard post-hip replacement restrictions thereafter, with noted diminishment of pain; no cervical spine impairment; a history of headaches that are briefly debilitating but not of a frequency to preclude work; and mental impairments historically exacerbated by substance abuse and characterized generally as depression or bi-polar disorder with an underlying dependent

-21-

personality, which care givers have suggested would be responsive to the claimant's efforts and follow through with ending her dependencies.

(A.R. 19).

Plaintiff argues that it was "improper to reject a favorable opinion of a consulting physician solely because the examination was arranged by the claimant's representative." (Plf. Brief at 16). There is "nothing fundamentally wrong with a lawyer sending a client to a doctor." *Blankenship v. Bowen*, 874 F.2d 1116, 1122 n.8 (6th Cir. 1989) (*per curiam*). Courts have recognized that the results of a consultative examination should not be rejected "solely" because it was arranged and paid for by the plaintiff's attorney. *See Hinton v. Massanari*, 13 F. App'x 813, 824 (10th Cir. 2001) ("An ALJ may certainly question a doctor's credibility when the opinion, as here, was solicited by counsel. . . . The ALJ may not automatically reject the opinion for that reason alone, however."). Some courts have criticized ALJs for referring to opinions like Wagner's as "purchased opinions," but such statements do not provide a basis for overturning an ALJ's decision. *See, e.g.*, *Mason ex rel. Mason v. Astrue*, No. 10-621-M, 2011 WL 2670005, at * 6 (S.D. Ala. July 6, 2011); *Milan v. Commissioner*, No. 09-1065, 2010 WL 1372421, at * 10 n.3 (D. N.J. Mar. 31, 2010). Here, the ALJ did not reject Wagner's opinions "solely" or even primarily on the basis that the one-time examination occurred on a referral from plaintiff's counsel. It was entirely appropriate for the ALJ to note that Wagner had examined plaintiff on a referral from plaintiff's attorney and that the purpose of the examination was to generate evidence in support of plaintiff's claims for SSI and DIB benefits. *See DeVoll v. Commissioner*, No. 99-1450, 2000 WL 529803, at * 1 (6th Cir. 2000); *Pentecost v. Secretary of Health & Human Servs.*, No. 89-5014, 1989 WL 96521, at * 1 (6th Cir. Aug. 22, 1989); *see also Gilmore v. Astrue*, No. 2:10-54, 2011 WL 2682990, at * 8 (M.D. Tenn. July

11, 2011) ("[T]he claimant underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal.  Further, the doctor was presumably paid for the report.  Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored.").  Psychologist Wagner saw plaintiff on one occasion and did not perform any tests supporting his conclusions. Mental health records that are "merely a regurgitation of the patient's own subjective history" are of limited utility, because it is the ALJ's job to determine the claimant's credibility.  *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d at 920; *see Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").  Opinions based on the claimant's reporting of her symptoms are not entitled to any particular weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Mitchell v. Commissioner*, 330 F. App'x 563, 569 (6th Cir. 2009).  I find that the ALJ's decision to give little weight to Psychologist Wagner's opinions is well-supported and entirely consistent with applicable law.

**2.**

Plaintiff argues that the ALJ erred as a matter of law in assessing the lay testimony of plaintiff's mother and stepfather.  (Plf. Brief at 23-25; Reply Brief at 6-8).  This argument is patently meritless.

Plaintiff and the VE were the only witnesses who testified at plaintiff's hearing:

ALJ:          Any witnesses other than the claimant today?

-23-

ATTY:          No.

(A.R. 31).  Plaintiff's mother and stepfather never testified.[10]  Further, if these individuals had

testified, and if the ALJ rejected their testimony, it would not provide a basis for disturbing the

ALJ's decision.  It is the ALJ's function to determine the credibility of the witnesses.  *See Siterlet*

*v. Secretary of Health & Human Servs.*, 823 F.2d at 920; *see also Reynolds v. Commissioner*, 424

F. App'x 411, 416-17 (6th Cir. 2011).

Plaintiff argues that the ALJ "erred in failing to apply SSR 06-03p to the lay

testimony." (Plf. Brief at 24).  The "lay testimony" is a sworn statement plaintiff's attorney elicited

from her mother and stepfather in support of her claims for DIB and SSI benefits.  (A.R. 247-59).

Mr. and Mrs. Davis stated that plaintiff had moved in with them in June 2008 and that she moved

out into her own place in January 2009.  (A.R. 251-52, 256).  Ms. Davis reported that plaintiff was

a financial dependent and that she could not afford to keep giving plaintiff money:

> Q.       In terms of Robin's dependency, does she depend on other people in order to try and lead a normal life?
>
> MS. BEULAH DAVIS: Yes.  Yes, she does.
>
> Q.       Give me a little example of the type of support that Robin has needed in her life from her family.
>
> MS. BEULAH DAVIS: Money to survive.  Lots of money, we have given her.  I mean she couldn't make it if we didn't.  There is [sic] times when she had to have it to live.  I can't afford to keep giving her money.

(A.R. 252-53).

------

[10]If plaintiff's attorney believed that the testimony of Mr. and Mrs. Davis was critical to his client's claims, he should have arranged for them to appear before the ALJ.  It is extraordinarily unlikely that the ALJ's questions would have been as one-sided as those posed on August 20, 2009, by plaintiff's counsel.  (*See* A.R. 247-59).

Plaintiff's counsel obtained testimony regarding plaintiff's migraine headaches, depression, subjective complaints, and inability to work:

Q.    When she has a migraine, does it disable her for most of the day?

MS. BEULAH DAVIS: Yes.

* * *

Q.    Beulah, looking back now, back on your daughter's life, at what point do you think her depression and anxiety became a pretty serious problem?

MS. BEULAH DAVIS: Well ever since her divorce. That took her down in life, but she carried on for a few years. I would say mostly the last eight to ten years, the depression and everything got worse.

* * *

Q.    During that eight and a half month period [when plaintiff lived with you], can you please give me an example of the types of complaints she would make?

MS. BEULAH DAVIS: Oh, my goodness. Everyday she got up, I didn't want to hear it because it made me hurt. She had a bad headache; her back hurt; her hip hurt. That was before her hip operation. That was bothering her terrible. Her legs; her anxiety. I listened to this every day for eight and a half months. Everyday something was wrong.

* * *

Q.    How was or -- currently, what I'm talking about is the condition of Robin, I'm really talking about the last three years. Does she have problems with fatigue -- being tired?

MS. BEULAH DAVIS: Yes.

Q.    Dave, does she take naps during the day?

MR. DAVE DAVIS: Yes. Lots of them.

* * *

Q.    What I would like to ask you is this question: What's your judgment about Robin's ability to work at a real simple job, currently? Let me describe what I'm talking

about.  Not something that would be very demanding, but she would be required to work eight hours a day, five days a week with no special treatment or accommodations.  Can you think of any job she would be able to perform?

MS. BEULAH DAVIS: No, not one.

Q.   Between you and Dave, can you give me some of the reasons that you believe that Robin would not be able to work, and could you -- could you give me some of the reasons in terms of limitations that you see with Robin as to why she could not work?

MS. BEULAH DAVIS: Because she wakes up every morning and there's something wrong with her.  She is sick, one way or another -- anxiety, depression, her body.  It's something every day.  It's a migraine.  It's one of these things every day.  Maybe not all of them every day, but something different every day.  There is no way she could keep a job.

Q.   Dave, would she have problems with attendance?

MR. DAVE DAVIS: Oh yes.  Yes.

Q.   Why do you say that?

MR. DAVE DAVIS: She never feels good.  Every day she gets up, she either has a migraine, or her legs are just killing her, or she has anxiety attacks.  I just don't see Robin ever working, again.

(A.R. 250-57).  Mr. and Mrs. Davis asserted that plaintiff had never "abused" cocaine and that she did not drink alcohol during the eight and one-half months she lived with them.  (A.R. 253-54).

The statement that counsel elicited from Mr. and Mrs. Davis is not evidence from an "acceptable medical source."   20 C.F.R. §§ 404.1513(a), 416.913(a).  Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule.  *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and*

*Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 1 (SSA Aug. 9, 2006));

*see also Hickox v. Commissioner*, No. 1:09-cv-343, 2011 WL 6000829, at * 4 (W.D. Mich. Nov. 30,

2011).   Parents and other relatives are classified as "other sources"  20 C.F.R. §§ 404.1513(d),

416.913(d).   The ALJ is required to "consider" evidence from other sources.   20 C.F.R. §§

404.1527(b), (d)(4), 416.927(b), (d)(4). This is not a demanding standard, and it was easily met here.

The ALJ considered the statement supplied by plaintiff's mother and stepfather, but he did not find

it persuasive:

> As for the opinion evidence, the record includes a deposition from the claimant's mother and
> step-father (Exhibit 13E).  There is no indication of any professional basis for their opinions,
> so they are considered non-medical observations.  They spoke in terms of the claimant's
> longitudinal history and the fact that from time to time she is incapacitated by one thing or
> another.

(A.R. 18).  The ALJ rejected the extreme restrictions suggested by Mr. and Mrs. Davis.  He found

that plaintiff retained the RFC for a limited range of sedentary work and her "mental impairments,

historically exacerbated by substance abuse and characterized generally by depression or bi-polar

disorder with an underlying dependent personality disorder, which care givers have suggested would

be responsive to the claimant's efforts and follow through with ending her dependencies." (A.R. 19).

Plaintiff argues that the ALJ's explanation was inadequate because he did not provide

an analysis of Mr. and Ms. Davis's opinions under the factors listed in SSR 06-3p.  (Reply Brief at

6-8).  SSR 06-3p is phrased in permissive rather than mandatory terms:

> In considering evidence from "non-medical sources" who have not seen the individual in a
> professional capacity in connection with their impairments, such as spouses, parents, friends
> and neighbors, *it would be appropriate* to consider such factors as the nature and extent to
> the relationship, whether the evidence is consistent with the other evidence, and any other
> factors that tends to support or refute the evidence.

2006 WL 2329939, at * 6 (emphasis added).  SSR 06-3p uses the permissive term "should" in

connection with the ALJ's explanation of the "consideration" given to "other source" opinions:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of the opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator *should generally explain the weight given to the opinions from these "other sources,"* or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at * 6 (emphasis added).  I find no error in the ALJ's consideration of the August

20, 2009 statement elicited from plaintiff's mother and stepfather, or in the weight the ALJ elected

to give to the opinions found within the statement.

### 3.

There is no developed argument in plaintiff's initial or reply brief corresponding to

her third claim of error:  the "Commissioner erred as a matter of law in assessing Ms. VanPortfliet's

credibility."  (Plf. Brief at 4, Statement of Issues ¶ III, docket # 13, ID# 626).  Issues raised in a

perfunctory manner are deemed waived.  *See Geboy v. Brigano*, 489  F.3d 752, 767 (6th Cir. 2007);

*see also Allen v. Highland Hosp. Corp.*, 545 F.3d 387, 406 (6th Cir. 2008); *Anthony v. Astrue*, 266

F. App'x 451, 458 (6th Cir. 2008).

Even assuming the issue had not been waived, it is without merit.  It is the ALJ's

function to determine the credibility of the witnesses.  *See Siterlet v. Secretary of Health & Human

Servs.*, 823 F.2d at 920.  Credibility determinations concerning a claimant's subjective complaints

are peculiarly within the province of the ALJ.  *See Gooch v. Secretary of Health & Human Servs.*,

833 F.2d 589, 592 (6th Cir. 1987). "An ALJ is in the best position to observe witnesses' demeanor and to make an appropriate evaluation of their credibility. Therefore an ALJ's credibility assessment will not be disturbed absent compelling reason." *Reynolds v. Commissioner*, 424 F. App'x at 417; *see Norris v. Commissioner*, No. 11-5424, 2012 WL 372986, at * 5 (6th Cir. Feb. 7, 2012) ("Because a reasonable mind might accept the evidence as adequate to support an adverse-credibility determination, we conclude that substantial evidence supports the ALJ's finding."). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773. "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993). Here, the ALJ gave a lengthy and detailed explanation why he found that plaintiff's testimony regarding her subjective functional limitations was not fully credible. (A.R. 14-

19).  I find that the ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

**4.**

Plaintiff argues that the hypothetical question the ALJ posed to the VE was deficient because it "did not reflect Ms. VanPortfliet's limitations."  (Plf. Brief at 25).  A VE's testimony in response to a hypothetical question accurately reflecting a claimant's impairments provides substantial evidence supporting the Commissioner's decision.  *See Varley v. Secretary of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  A hypothetical question is not required to list the claimant's medical conditions, but is only required to reflect the claimant's limitations.  *Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004).  The ALJ found that plaintiff's subjective complaints were not fully credible.  A hypothetical question to a VE need not include unsubstantiated complaints.  *See Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010) ("[I]t is 'well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.'") (quoting *Casey*, 987 F.2d at 1235); *Grant v. Commissioner*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.").  I find that the hypothetical question posed to the VE was adequate, and that the VE's testimony in response provides substantial evidence supporting the ALJ's decision.

## Recommended Disposition

For the reasons set forth herein,  I recommend that the Commissioner's decision be affirmed.


Dated:   March 26, 2012                    /s/  Joseph G. Scoville_____
                                                       United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).